Good afternoon. May it please the court, I'm Jacqueline Koch on behalf of the appellant, and there are two cases in front of you today. One is a mandamus and the other is an appeal. Basically, the idea being if we can't have one, can we have the other? There's something that really puzzles me about this case. I just don't get it. Okay. How come you couldn't find two plaintiffs who got their hours from Kate? I mean, Ms. McElmurry testifies at her deposition, well, gee, I didn't truncate, I just rounded, which the regulations say is just fine. And my manager thought that was the right thing to do. So the bank publishes this ridiculous policy where you're supposed to truncate, but she doesn't do it, and her manager is fine with that. So, and it looks like the other plaintiff doesn't truncate either. So I don't see where you've got decent plaintiffs that would be similarly situated. It looked to me when I read the judge's decision as though that's what bothered him. I, well, I think it, and I'm not sure which part you're reading, and maybe I'm reading it differently. I agree that in terms of one of the plaintiffs, there was no use of the truncation chart. If I recall the testimony, and please correct me if I'm wrong, that McElmurry was not able at her deposition to recall that she had used it. But I believe- I thought McElmurry was more definite in her deposition. She rounded, but- She also rounded. Here's, here's, let me, let's see if I can explain the problem here. I think I can explain the problem, but maybe not. Here's what I think the problem is. There are two things going on at once. And they happen at the same time on the same sheet. Well, no, that's wrong. They don't happen at the same time. They happen in seriatim. First, you come in in the morning, and you write down your time. And you write down your time. You don't write down tenths of an hour. And then you go home, or you go off for lunch, or you do whatever. You write down your time each time. And there's rounding up and down, which is perfectly fine, because you're rounding up or down, not just in one direction. At the end of the day, you're supposed to enter into your timesheet the tenths of an hour, what you worked. That's where the truncation sheet is a problem. Because if you use the truncation sheet, and there is more than one sheet that they used. And there were other sheets that didn't have this problem. But with the use of the truncation sheet, the problem that you have is that you're always rounding down. I don't understand. I thought Macklemore said, if I get in at 7.58 and I'm supposed to get in at 8, I write down 8. And if I get in at 8.02, I write down 8. Yes, you betcha. But that's not the problem. You're right, but that's not the problem. Here's the problem. Let's say she gets in at 8.02, and she writes down 8 o'clock. And she leaves at 4.58, and she writes down 5 o'clock. That's what she said she did. And that's a wash. It's not a wash. She gained it at both ends, but it's fine. I gave a bad example. I meant it to come out even. In any event, over the week, presumably, that's the kind of rounding that comes out, because you go up and you go down depending on how close you are to the mark. However, the truncation chart is not blind. Under the truncation chart, if she had written down 8.05, and they did it to five-minute intervals is pretty clear if you look at what they all look like. If she did it to 8.05, and now she has to, at the end of the day, she has to look at the truncation chart in order to enter how many hours she worked. In other words, you don't just subtract your hours. You have to use this conversion chart. And 8.05 always rounds down. That's what she said she did. Just base your hours on the rounded time she had written down. I apologize if I'm explaining this badly. I was thinking I would have had trouble following the chart if I were an employee statistics. Yes. If that time is a base 60 number, it's hard to do arithmetic. It's a very difficult chart to follow. I believe that there is evidence of her timesheet, though, that shows the rounding of using that chart. I believe that we're required to use that chart. And if I am misleading the court, I am desperately apologizing now, and I will look when the other side is talking. But my understanding is the crux of this case is jurisdiction, whether they're rounded or not. Whether or not an order is unreviewable under Cohen if the legal and practical value of the relief denied would be destroyed if not vindicated before trial. What legal or practical advantage of the person's already a party to this suit would be destroyed if you were forced to wait a final judgment before appeal? The problem is the statute of limitations because — Not for these parties. These parties are here. Nothing would affect these parties. The named plaintiff, but not the unnamed plaintiff. I'm speaking about the named plaintiffs. What legal or practical advantage of the person's already a party to the suit would be destroyed if you were forced to wait for a final judgment? Oh, I'm sorry. You know, I wasn't quite hearing what you said. I apologize. Already a party to the suit. Yes. That's what the Cohen factor to me is all about. Would they be affected? Now, it would be wonderful to have millions more there, but the Cohen factors go to the parties who are already there. They're in court. They have their claims, and they're claiming, well, you know, the collateral order doesn't apply. Collateral order doctrine, there is jurisdiction, but maybe you can explain to me, and I don't understand, how they are affected, but not — The named plaintiff is not affected if the named plaintiff still gets to prosecute. It's only the unnamed plaintiff. It would be the class that's affected. Okay. And so — All right. But doesn't that go into jurisdiction? Yes, it does. And if, in fact, this is something that the court finds is not appealable under that case, then the question is, should it be the subject of a mandamus? All right. And you mentioned that the non-parties might lose their statute of limitations because of the statute. Can you cite to me, and I couldn't find any case where the third Cohen factor was satisfied because some interest of a non-party would be destroyed by awaiting final judgment? I don't — well, certainly I can't cite you a case that would say that. I'm trying to think if I read a case that dealt with a class that had not yet been certified, and I'm assuming you're including in your search that kind of case. The non-parties, of course, will argue we need to come in now because of the statute, but the Cohen factors deal with the parties. And that's — I'm trying to find jurisdiction for you, but I can't find it. Well, and I'm sorry that I can't cite a case to you which would give you the ability to do that. Thank you. Proceed with your argument. I'm sorry. Can you help me with that other detail of class certification? If I understand it correctly, you don't have to get an order from the judge certifying in order to give notice. It would be nice to. It's recommended in the cases as a good way to manage cases. But you could, if you wanted to, independently of the court, advertise and get additional plaintiffs to opt in. Is that correct? I don't believe so. The court has exercised very strict reigns. Do you have a court that says you can't? Citing authority that says you cannot advertise. I'm asking you, can you or can't you? And you're saying, I don't believe you can. So just tell me the authority because I'm confused. The authority would be the collective action section under the FLSA plus the rules, and I'm not thinking of what it would be, where the court is allowed to conduct these actions in the way the court deems fit. In other words, it's the court that would authorize the notice to go out and authorize what is allowed to be said. I'm looking at the FLSA. Well, 216B is the section that allows collective action, and that allows people to opt in. But in order for there to be an opt-in, there has to be a notice, and that notice is controlled by the court. You cannot file your own notice? You couldn't put an advertisement in the paper that says you think that you've been – that if you worked for a U.S. bank during this period, you may have money coming to you. Contact so-and-so. I've seen those, but no, I think those are two different things. I think that the notice that the court sends out is something that is authorized by the court. The court says you – Yeah, but I understood Judge Kleinfeld. In terms of can you advertise, that is a risky business if the court has said to you, you will not contact these people, you will not do this, you will not do that. Where? I'm sorry, Your Honor. The court – where? Yeah, where has any court said you will not do this? And this is where I'm going to have a problem because I'm not sure that it's in this case. There are several cases against U.S. banks, and the courts have done it, but I don't. I know in particular cases – As I'm standing here, I don't know if it's done here. I know in particular cases the judges give notice orders. Usually they give notice orders. And they say, here's how to do it. Don't do it any other way. Do it this way. Here's how it works. Right. But I'm asking you something different where there is no notice order from the court. Can't you just put an ad on late night TV or in the newspaper like the one Judge Bybee hypothesized and round up your own claims? If – I don't know. If the court had not entered any order and there was nothing – had not said that there was a restriction on the plaintiffs from contacting these people and there are restrictions, but if there were not, then potentially if it were not violative of the ethics rules, one could do that. Well, I'm thinking the ethics rules on soliciting clients went out the window a long time ago during the Berger courts, I recall. And they're soliciting them all the time. And the harm that you argue for in your brief is basically the plaintiffs that don't get joined in the collective action are going to have limitations run on them before this is over. And my thought was, well, you can help them if you want to protect them from that as much as anyone can and also help yourself. Just put an ad on late night TV. There are multiple orders against – involving U.S. Bank against the plaintiffs' attorneys contacting different classes. In this case? I don't know. But they – In this case? I believe they would affect this case. Is there something in the record that we can look at so that we can say you're not allowed to do that? I don't know. I'll have to look. I apologize, Your Honor. I wasn't anticipating that question, obviously. But there are – I do know that there are multiple orders and some of – there's overlap. So to what effect it would affect this, I really feel badly that I can't tell you that. Well, having reviewed the record myself, at least I couldn't find anything. And I think one of the reasons you don't advertise – it's expensive to advertise. And I think that's why some plaintiffs don't. And they want the court to order notice. But it will be interesting if you find something in the record. I appreciate that. I will reserve my time unless there was another question. Good afternoon. May it please the Court. I am Tim Volpert for U.S. Bank, the defendant in this case. I have a – Counsel, would you speak up? I'm sorry, yes. I'm Tim Volpert, and I'm representing U.S. Bank, the defendant in this case. And I'm thinking that it may become relevant and helpful to the court for each of you to look at one of the documents from the S.E.R., page 112. Would it be possible to hand these to the clerk just so you have access to them? We already have them. Oh, if you have the R with you, that's good. Okay. And that's – It may be convenient for you. Okay. Do you want one? Well, you let me know if it is. Not at this moment. Did you say you wanted one? Yes. Yes, hand them off, please. S.E.R. 112. Good. I have S.E.R. 116 and 122, but not 112. It should be a timesheet. It says – I guess you have it now. All three of you get it? Okay. Of course, this might be helpful in clarifying one of the questions about what Ms. McElmurry testified to. But first of all, if I may, now that I've drawn your attention to this exhibit, let me focus away from that a moment and talk to you about notice. Because I think, with all due respect, there's absolutely no prohibition against the plaintiffs giving notice to class members. In fact, in the – I believe it was the Hoffman-LaRouche case that is cited in our brief, the court – a divided U.S. Supreme Court decided that courts – that federal courts were even authorized under the statute to participate in the notice process. And the majority held that they were authorized to participate in notice. But Justice Scalia and Chief Justice Rehnquist dissented and said, where in the world do you find that in the statute? Called it midwifing the case and said, gee, it was not too long ago when lawyers wouldn't dare solicit, and now you're saying the court should supervise the solicitation. I'm not actually getting one way or the other on that, but I'm just saying that it is clear that the individuals can give notice. In some circumstances, as the court points out, the notice could be expensive. In this case, I will point out, however, that for at least 77 plaintiffs – or I believe it was 79 plaintiffs – individuals whose timesheets the plaintiffs used in their two submissions, I can't imagine it would be unduly expensive for those individuals to be contacted. So the answer to the question is, certainly the court can be involved – excuse me, certainly the individual plaintiffs can get involved in the notice process. Now, with regard to what Ms. McElmurray testified to, I think there was some assumption that she had said that she never rounded up. It gets a little confusing, but I think it's helpful to talk about this, and not just in the context of answering that question, but in the context of understanding why these are inherently individualized determinations on the merits of these claims. The timesheet that I handed you is Sharon Harrington, and what I want the court to understand is – and then close to the bottom there on the right is this rounding chart. But there's a whole lot of variations in what could happen with individual employees and individual timesheets, because they walk in and the first thing they do is they write down their time. And what Ms. McElmurray testified to, and I think what the court is referring to, is that Ms. McElmurray, when she wrote her time down, sometimes rounded up, sometimes rounded down. When she wrote her time down, that's the first instance where rounding comes into play here and where you needed individualized determination. Then, allegedly, the rounding chart, once you get a total amount of time, the rounding chart then sometimes results in rounding up, sometimes results in rounding down. So there's really two aspects of rounding here, which you have to examine every single timesheet for every single week for every single plaintiff to determine. Now, for instance, okay, so in the deposition testimony, focusing now on what she actually wrote down. This is Ms. McElmurray. Oh, I'm sorry, we are, but okay, we are. But the example I want to give you with regard to Ms. McElmurray, this is to show you what the chart looks like for now. And what I want to tell you about Ms. McElmurray in response to the court's question about her rounding, not rounding up, I'm just saying on page 29 of the brief, she's asked if you come in back from lunch at 1.02, what would you write down on your timesheet as your lunch end time? And she said 1, 1 o'clock, which of course would be giving her an additional two minutes of time. If you came back from lunch at 1.03, what time would you put down as your lunch end time? 1.05, etc. So the point is that Ms. McElmurray was herself inconsistent on how she wrote down her time on the individual entries, when you got in, when you went to lunch, when you returned from lunch, and when you left at the end of the day. Now, so, and there's other examples which we cite in our brief where that is the case. So the first thing you would have to do to make a determination on the merits of any individual's claim is you would have to find out from that individual, like we found out from McElmurray, what did you do when you came in? Did you sometimes round up? Did you sometimes write, come in at 1.02 and wrote in that you came in at 1? Because in that case, you've been benefited. Or in other cases, you know, etc., etc. I think the court hopefully gets the point on that. Then, then you get totals. So you total up your time at the end of the day. And then the question becomes, on an individual basis, how did you use the truncation chart, or excuse me, they call it truncation chart, the rounding chart. Because not everybody used the rounding chart, number one, and not everybody used it the same way. So as this SER provision illustrates, for instance, with Ms. Harrington on this particular day, according to her, she had, if you look at when she came in, when she left, etc., etc., she worked six hours and 15 minutes. Under the rounding chart, she should have written down 6.2. Instead, you notice that she wrote down 6.3, which inured to her benefit. In the next entry down, same kind of situation. If you add up the time that she wrote down subjectively, she had eight hours and 20 minutes. Under the rounding chart, that should have been 8.3. What she wrote down was 8.4. Now, there are numerous examples of this, which demonstrate that you have all these variations, and you would have to look at each individual plaintiff and ask, how did you record your time on your time sheet? Did you round up? Did you round down? Did you apply the rounding chart? How did you apply the rounding chart? And to complicate things even more, you would then have, not all of the... ...depending on the defense rather than the claim. The claim is, the company has a policy of telling people to truncate. The chart indicates that at least for the time it did. The defense is basically, the people don't follow our instructions. They truncate as they're supposed to. First of all... ...that it's true, but I don't think it has much to do with anything. Your Honor, it doesn't matter if it's the claim or the defense. The question here, for purposes of finding that this so-called class is similarly situated, is that when you get to the merits, in order to prove the case or to disprove the case, you have to look at each individual employee and how they dealt with the time sheets and the rounding charts. I might add, you also have to know which employees used this particular rounding chart. There were several rounding charts out there. Ms. McElmurray said that she used this rounding chart. She also used forms with other rounding charts. So, the point... Let's say a company has a policy. We are going to underpay everybody by 1% because we keep them in the past. Locally underpay everybody. Not this case. And suppose the people in the bookkeeping department don't understand the policy and they misapply it. Some people lose their 1% and some don't. You're saying you couldn't sue the company and certify... It's not called certifying a class. This is opt-in, but the wage and hour equivalent for the company policy of willfully depriving everybody of 1%. If that policy always applied exactly in an objective fashion to the employees, then you could. Between the cup and... There's many a slip puts the cup in the lip. People are supposed to execute it. Don't get it right. Well, but if the policy depends, and if adjudicating the claim, which is not just proving liability, but also proving damages, if that depends on looking at how people dealt with the policy on a day-in and day-out basis, then the answer is that they're not similarly situated. But let me tell you one more factual thing here. The issue here, I think it's fair to say under this record, is not what U.S. Bank's policy is in this regard. More specific here before we move on to that next point. On Mackle-Murray, I remember her deposition testimony. Basically, she didn't even know the case was about truncating. She didn't truncate. She grounded. She didn't understand the whole truncation business as far as I could tell, and didn't truncate. And this isn't an appropriately similarly situated plaintiff to anyone affected by truncating. I can't remember about the other plaintiff. Who was the other plaintiff? The other plaintiff, Mackle-Murray is the only plaintiff involved in the rounding issue here, named plaintiff. Now let me ask you something different that bothers me. If you prevail on jurisdiction, do we have to say never, or do the authorities permit us to say hardly ever? It looks as though, under Cohen and Coopers and Librand, you've got a strong case for no jurisdiction, as has often developed in the questions. And it's real hard for me to imagine all the cases that could be brought, so I'm wondering if there's room to say hardly ever, or if you have to say never to go your way. I think there's room to say never under the collateral order doctrine, but recognize that there is a possibility of getting certification under Section 1292B. And the court, Justice Stevens, in the Coopers v. Librand case, obviously that was a Rule 23 case, but the court there talked about and thought it was significant that they were talking about the death knell doctrine there, which would have allowed an appeal from these types of cases. And the court said that that was no longer grounds for jurisdiction. But the court said, you know, Congress considered this and dealt with it with Section 1292B, which allows, at the first level, the plaintiff to ask the district court to certify the question for appeal, interlocutory appeal, and then if the district court does, you probably know this, goes to the circuit court. Okay. Where was that discussion with the case? It was in Coopers v. Librand. In Coopers, in the dissent? No, it was actually in the U.S. case itself. And he's talking about, yeah, I have, I think this is at page four, it must be 437 U.S. 474, and he talks about the principle vice of the death knell doctrine, which again would have allowed an appeal before the court said it wasn't available, is that it authorizes indiscriminate interlocutory review of decisions made by the trial judge. It says the Interlocutory Appeals Act of 1958 was enacted to meet the recognized need for prompt review of certain non-final orders. However, Congress carefully confined the availability of such review, and then he talks about how you have to go through the district court first, and then you have to go through the circuit court. He says this screening procedure serves the dual purpose of ensuring that such review will be confined to appropriate cases and avoiding time-consuming jurisdictional determinations in the court of appeals. That's the answer, and so that makes it a hardly ever. Pardon me? That makes it a hardly ever rather than a never. Well, I don't know if it makes it a hardly ever. I mean, you can find cases, if you look at the cases, you know, none of these cases that have been cited in the briefs where they reach the merits of a certification issue has ever been based on a collateral order doctrine. But you can find some of these cases, and I could find them if you'd like, that have been certified under 1292B. So I guess it does mean a hardly ever. I mean, it would not be easy to do. You wouldn't argue, though, that it's never under Cohen. It's just that it's available under 1292. Never under Cohen, yes. Yes. So I don't know if that answers the question. And the mystery here is that the plaintiffs didn't seek such certification. So let me just move just quickly. It looks like I'm using up my time here. Are you saying the plaintiff didn't seek 216B certification? No, I'm sorry. When I say certification, I'm talking about now 1292B, which is the statute that allows an interlocutory appeal to be filed. You know, when you look at what's going on here, the court may not be aware that we have the appeal from the certification order, and this is before you today. We have the mandamus from the certification order that's before you today. And we have, in December of last year, the plaintiffs filed another appeal in this case from the order not certifying the other class of plaintiffs in this case. So this is a wonderful example. Was the order that was filed in December, was that just another try, another run at this? No, no. That was a different, they were seeking certification of another potential class in the case. But the point is certainly that they, you know, if this can happen, then we know from Supreme Court precedent that there's supposed to be a great deal of discretion for courts overseeing class actions. And if you open up this can of worms and allow just appeals whenever somebody wants to walk in and file a notice of appeal in a case such as this, from every decision that's being made, or from at least every certification decision, that's going to wreak havoc in a system that's supposed to be devised to give a great deal of discretion. However, in my opinion, if we have jurisdiction, and I'm not saying that we do, it seems to me that plaintiffs could make a strong case that there are other members that are similarly situated to the name plaintiffs. But, again, it all depends on whether or not there's jurisdiction. Well, all I can say, Your Honor, is that we disagree with that, obviously. It is hard to make an argument that these plaintiffs are similarly situated. Any of these would-be class members were similarly situated. Your argument is that there are individual cases. It would absolutely. I understand that. I mean, I don't want to use hyperbole here, but one thing I'm convinced of in this case is it's an absolute certainty that in order to – well, I shouldn't say it's an absolute – but it's pretty clear that you would have to – you have to go through an individualized analysis of every timesheet of how people use their timesheets, of whether they use the rounding chart, of how – Another case of 1.7 million in attorneys fees. One thing I do want to address with regard – I assume that wasn't a question. No, I was just thinking what you described, as opposed to the way most of us would have done it in real life, hire an accountant to do a spreadsheet, and the other side hires their accountant. They argue a little about the difference in their spreadsheet to be done, as opposed to exposing every individual about their intents and values. Right. It sounds like you're saying, oh, I'll tell you to expose every individual about their intents and values and their minutes, and you don't know who's similar or what. Well, you couldn't, because – well, there's no similarity, because how would you know if Plaintiff A, in the wash, ended up rounding up or rounding down overall? Your Harrington example is very interesting, but it's clear that Ms. Harrington has not accurately – when we're dealing in tenths of an hour, she has not accurately recorded her hours. But your conversion chart, if somebody is honest and accurate, two different things in this, consistently devalues the amount of time that your employees have put in. It does not consistently devalue if the employee's time is divisible by six minutes. So if the employee comes in right on eight and leaves, et cetera, et cetera – That's another determination. If I work an extra five minutes every day of my life under this chart, I will get an even number of hours. If I work eight hours and five minutes every day of my life for U.S. Bank, I'm never going to get any more credit than for eight hours a day. If you applied – if all of the numbers were correct and you were putting an exact number down on your timesheet and you were using the rounding chart, not everyone did either of those things, and you weren't divisible by six-minute entities, then yes, this particular chart would round down. But I want to make one thing very clear because the court was asking about a policy. And I want to make something clear here. This case at this point and this motion is not about a policy. It's undisputed in the record that U.S. Bank's policy was to round to the nearest tenth of an hour. Tenth of an hour. The issue here with regard to this order is this particular rounding chart. Okay? This is not that U.S. – they backed off – they're one and the same. No, they're not. They're not the same at all. I haven't gotten paid for most of my time in my law office. There's so much of it with brief phone calls and dictating brief letters and reading brief letters. Truncating means you don't get paid for anything that takes less than a tenth of an hour. But understand that that is only on this particular rounding chart. There are numerous rounding charts that are out there. Ms. McElmurry herself used three different rounding charts during the relevant period. It's entirely possible that plaintiffs would have used more than those three because what happens is they get posted. The current one gets posted on the Internet. Employees run off 50 or 100 copies. The evidence shows. Couldn't it be a common question of law, though, as to whether it's lawful to use a truncating chart as U.S. Bank is using, irrespective of the details as to whether each chart in its particulars is the same as every other chart? Well, I think if you were conceivably if you were doing an FRCP analysis and you looked at the commonality issue, I think that I'm not sure how you'd come out on that. But the similarly situated analysis, and the courts are clear on this in looking at it, requires that you look at, again, your goal is to see if you would actually have to sit down and look at individual adjudications. And so the answer to the question in a similar situated analysis is, well, even if they even if they use this rounding chart, you still you could not just ask yourself, could you conceivably adjudicate Ms. McElmurry's claim? At the end of the sentence, because you're over your time. Could you conceivably adjudicate Ms. McElmurry's individual claim without asking her questions like, whether she used this rounding chart, whether she wrote down her time accurately when she came in and left, how she applied the rounding chart? And the answer is, it would be impossible. If you walk in the court today and were trying that case, you would have to look at all those issues in order to adjudicate it. And that's it. Thank you. May it please the Court, in terms of what you would have to prove at trial, perhaps counsel is overstating the case a bit, because it's up to the employer to keep accurate time records. It's really not up to the employee. And these records were reviewed by the supervisors, or at least that appears to have been the process. So yes, people make mistakes when they're entering time. I'm sure that that happens. And I'm sure that you can pick out some timesheets that are a problem. But all in all, that particular truncation chart was used widely by U.S. Bank. And as the Court noted, whenever you use it, you're going to lose time unless you happen to enter a number that ends with a zero for every single entry, including lunch and your lunch time. This is an excerpt that our attention was drawn to of S.E.R. 112, if I'm correct. He actually worked six and a quarter hours. He got paid for a little more than that, 6.3 hours. The conversion chart said he should have only gotten paid for 6.2 hours. He put in for 6.3. Her supervisor approved it. And I don't have it in front of me, but I'm sure you're reading it accurately. As I said, it would be very easy to find in any list of time cards that there were errors. In terms of how you would show this, though, in terms of computing damages, which is where you would be, is once you showed liability, which one convinced words about this, but the truncation chart clearly takes away the best the employee can do is break even, unless they make a mistake and inadvertently get paid a little more because the supervisor doesn't catch it. But otherwise, they're going to either break even or they're going to lose money. And there was a statistical analysis done by plaintiffs showing what the likelihood was and so forth over all of these plaintiffs. In terms of having to depose every person to say, well, did you make a lot of mistakes as an ordinary time of doing your numbers? I mean, I don't think so. I mean, the truncation chart speaks for itself. Either they did it accurately or they didn't, but clearly that was the policy of the bank. They published it. They had their people use it. And for the most part, they did use it accurately using the truncation chart. So what's so hard about that, really, when you come down to it? One thing that was brought up, and I apologize for not knowing all of the details about all of the litigation, but in fact, apparently there was an order in this case at some point in time prohibiting the plaintiff's attorneys from making various kinds of contact. I don't know. I'm sorry? Do you have a page number in the excerpt so that you can tell us? I do not. I don't believe it's in the excerpt. I don't believe it's in the excerpt, Your Honor. I apologize. Your biggest problem is probably Cohen and Coopers and Libram jurisdictions. Do you have any more to say about it? No. I don't have any more to say about Cohen, but I can think of something. Well, is there any other question that I can answer for the Court? Thank you.
judges: D.W. Nelson, Kleinfeld, Bybee